by their next friend, J.R.P.M. and G.C.M., Respondents,

Gary Bailey, Director, Division of Child Support Enforcement, Respondent;

and

C.L.M.K., Respondent Pro Se,

v.

R.L.C., Jr., Appellant.

No. WD 62626.

Missouri Court of Appeals, Western District.

April 27, 2004.

---

4. The record shows the time of the accident was approximately 11:50 p.m.

282

---

Joseph Nelson, St. Joseph, for appellant.

Randall Crawford, for respondents J & G M.

Carla Kyle, respondent, acting pro se.

Mark Goucher, for respondent, Division of Child Support Enforcement.

Matthew Liles, for J.L.M. and C.N.M., plaintiffs.

RONALD R. HOLLIGER, Presiding Judge.

The present matter arises out of a guardianship of two children, J.L.M. and C.N.M, both born in August 1988. Their father, R.L.C. ("Father"), appeals the denial of his motion seeking visitation with his two children and a recalculation of his administratively-ordered child support obligation. We find no error, and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The children have been in the custody of their maternal grandparents ("Grandparents") for nearly all of their lives. In 1989, both Father and C.L.M.K., the children's mother, filed written consents to the appointment of Grandparents as the children's guardians. In February 1990, a judgment was entered appointing Grandparents as the children's guardians.

Since that time, the children have had very little, if any, contact with Father. In 1993, the marriage between Father and Mother was dissolved in a Kansas dissolution action. The Kansas court's judgment stated that the parents would have joint custody of the children, subject to the 1990 guardianship judgment. The trial court entered no award of child support at that time. In a subsequent proceeding, the Kansas court, with the parents' consent, changed the children's last names to mirror Grandparents' surname.

The present proceedings apparently are an outgrowth of a 2001 administrative action by the State of Missouri to establish a child support order. It is not clear from the record before this court how this administrative action was initiated. (Father contends that it was initiated at Grandparents' request, but Grandparents deny that claim.) As a result of that administrative proceeding, both Father and the children's mother were ordered to begin making child support payments. Father's monthly child support obligation was set at $417 per month. Prior to that time, Grandparents had been providing all of the financial support for the children since at least their appointment as guardians.

In December 2001, Father filed a motion with the trial court, asking that the guardianship be modified. Specifically, Father asked that he be permitted visitation with the children and that the child support amount be recalculated. He subsequently filed a modified pleading requesting that the trial court also grant the following additional relief: (1) requiring the children to be enrolled in public school for the 2002–2003 school year; (2) directing Grandparents to cease making attempts to alienate the minor children's affections towards Father; (3) granting Father weekly visitation with the children; and (4) ordering that health insurance be provided by

the party best able to provide such insurance at a reasonable cost.

The matter proceeded to trial on January 10, 2003. Mother testified that she opposed visitation between the children and Father because of the disruptive effect it could have on them. Grandparents took the position that the children were old enough to decide whether they should have contact with Father. Both the children's Guardian ad Litem and their counselor reported that the children, now aware of the true identity of their parents,[1] had expressed their unwillingness to have contact with Father at this time There was also testimony that the children were beginning to become defiant with regard to the proceedings and the issue of having contact with Father. Their counselor reported her opinion that if the court ordered visitation, the children would have to be physically forced to attend visitation and that such actions would not be in the children's best interests. She also opined that forcing visitation on the children could delay the time at which the children would choose to seek out visitation voluntarily.

The trial court entered its judgment on February 12, 2003. While not condoning all of the Grandparent's actions with regard to the children, it found that the Grandparents had acted responsibly in the best interests in the children, overall, and that there was no evidence presented warranting court interference with the Grandparents' exercise of their authority as Guardians.

Regarding the visitation issue, the trial court found that Father had failed to make any attempt to have contact with the children for at least ten years, despite having financial means to seek visitation through the court. It also found that forcing visitation upon the children was not in the children's best interests. It therefore denied Father's request for visitation.

On the question of child support, the trial court found that the Form 14 child support amount calculations yielded a presumed child support amount of $454 per month for Father and $575 per month for Mother. Those amounts were not rebutted as unjust and inappropriate. It also ordered Father to provide health insurance for the children, with any uninsured medical expenses to be paid by the parents equally.

The present appeal follows.

### DISCUSSION

Father presents three points on appeal, most containing multiple subpoints.[2] Generally, our review is guided by the standard of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We will affirm unless the judgment is not supported by substantial evidence, is against the weight of the evidence, or misinterprets or misapplies the law. *Id.* With regard to challenges that the judgment was against the weight of the evidence, we view the evidence in

---

1. During the proceedings, it became apparent that the children were unaware of who their parents actually were. On Father's motion, the trial court directed Grandparents to inform the children about their parents' identity.

2. Our brethren in the Eastern District have stated, with regard to subpoints on appeal. "We do not encourage this practice. Separate issues should be stated in separate points. *Thummel v. King*, 570 S.W.2d 679, 688 (Mo.

banc 1978). On the other hand, where separate subpoints raise the same issue, they should be combined into one point which precisely formulates the issue in order to meet Rule 84.04(d)'s requirements of brevity and conciseness." *In re Marriage of Cohen*, 884 S.W.2d 35, 37 n. 1 (Mo.App.1994). Father's brief does not always adhere to this advice, unnecessarily complicating discussion of the issues raised.

the light most favorable to the judgment below. *Lavalle v. Lavalle,* 11 S.W.3d 640, 646 (Mo.App.1999).

With those standards in mind, we take up each of Father's three points on appeal, in turn, but find no reversible error in the proceedings below.

## I. The 1990 Guardianship Judgment Was Not Void

■ In the first of his three points on appeal, Father raises three arguments contending that the trial court erroneously declared the law regarding the basis for its jurisdiction to enter the present judgment. First, he contends that the original 1990 guardianship judgment was void because it failed to make a finding of parental unfitness that he claims was mandatory. Second, he argues that the Kansas dissolution judgment awarded joint custody of the children to the children's mother and himself. Third, he takes the position that the 2001 administrative child support modification was based upon the Kansas dissolution. Taken as a whole, the thrust of Father's three arguments in this point on appeal is, essentially, that the trial court's judgment was not a modification of the 1990 guardianship proceeding but was, instead, a modification of the 1993 Kansas dissolution decree.[3]

■ Essentially, Father's argument on appeal is a collateral attack on the validity of the 1990 guardianship. Collateral attacks on final judgments are generally impermissible. *See Taylor v. Taylor,* 47 S.W.3d 377, 384 (Mo.App.2001). One circumstance, however, in which collateral attacks have been allowed to proceed, is when the judgment in question is void. *See id.* For a judgment to be void, the

alleged infirmity must render the court without jurisdiction to enter the judgment or the record must establish that the judgment was entered in a manner that was inconsistent with due process. *Id.* at 385. A merely irregular judgment is not subject to collateral attack. *Id.* Similarly, an erroneous judgment is subject to attack only through direct appeal, not through a collateral proceeding. *See Estate of Davis v. Davis,* 574 S.W.2d 477, 481 (Mo.App.1978).

There is no contention raised here that the trial court did not have personal jurisdiction over the parties or subject matter jurisdiction to adjudicate the action. Rather, Father's first contention alleges that the guardianship judgment is void because it failed to make any finding of parental unfitness. Parental unfitness, however, is only one of three grounds upon which a court may order that a guardian be appointed for a child. Those three grounds are: (1) unwillingness of the parents to assume the duties of guardianship; (2) inability of the parents to assume the duties of guardianship; or (3) an adjudication of parental unfitness. § 475.030.4(2), RSMo. As the statute states those grounds in the disjunctive, it follows that only one of those grounds needs to be present. Put another way, it was unnecessary to base the judgment upon parental unfitness if either of the other two grounds was present.

■ Moreover, there is no requirement within Section 475.030.4, RSMo, that the trial court make express findings with regard to any of these three grounds. While including such findings in the judgment would, perhaps, be a good practice, it is not mandated by statute. Indeed, in circumstances where the trial court fails to make such findings in support of its judg-

---

3. We note, in passing, that Father did not raise this particular argument in the proceedings below and instead raises the question of the validity of the 1990 judgment for the first time in the present appeal.

ment, we may imply that the trial court found that substantial evidence supported at least one of the statutory grounds underlying its judgment. *See Matter of T.A.P.*, 953 S.W.2d 638, 642 (Mo.App.1997).

■ Thus, the ultimate question Father presents in his first argument is not whether the court lacked jurisdiction to enter the 1990 guardianship judgment, but instead whether the findings implied by that judgment were supported by substantial evidence. A judgment may not be collaterally attacked on the grounds that the evidence supporting it is insufficient, even if the challenging party shows that the evidence would not be sufficient to uphold the judgment on direct appeal. *See K & K Invs., Inc. v. McCoy*, 875 S.W.2d 593, 597 (Mo.App.1994).

Having resolved the issue of the validity of the 1990 guardianship judgment for purposes of the present appeal, we need not reach the other two arguments raised by Father in his first point on appeal, as those arguments rely upon a conclusion that the 1990 judgment was void. Point denied.

## II. The Trial Court Did Not Err in Denying Father Visitation

■ For his second point on appeal, also raises three separate arguments. As a general matter, trial courts are vested with broad discretion with regard to matters of visitation, and the exercise of that discretion is given great deference. *In re S.E.P. v. Petry*, 35 S.W.3d 862, 872 (Mo.App. 2001). We reverse such determinations only upon a showing that the trial court has exercised its discretion in a manner that is not in the child's best interests. *See id.*

Father first contends that the trial court erred in denying him visitation with the children because the guardians presented no substantial evidence to rebut the public policy articulated in § 452.375.4, RSMo, that frequent and meaningful contact with parents is in a child's best interests. In support of that contention, he takes the position that the trial court erred by failing to make any findings regarding the factors contained within § 452.375.2, RSMo, particularly with regard to issues of parental unfitness, domestic violence, or abuse. His remaining two arguments in this point on appeal are that the trial court failed to identify any statutes used in reaching its judgment and failed to make any statement of the grounds for its decision to deny visitation, in violation of Rule 73.01.

With regard to the first contention, Grandparents correctly note that Section 452.375.2, RSMo, concerns awards of *custody*,[4] not visitation issues. Father was not seeking a change in custody of the children, but instead seeking only visitation with the children. Thus, the second of the arguments he raises in this point on appeal is misplaced, and the trial court did not err in failing to address the factors outlined in that subsection in its judgment.

■ We reach a similar conclusion regarding Father's argument premised upon Section 452.375.4, RSMo. Father correctly notes that Section 452.375.4, RSMo, states a strong public policy preference that children have "frequent, continuing and meaningful contact with both parents...." That subsection, however, raises the issue of visitation in the context of determining the *custody* arrangement that will best facilitate such contact. Further, that provision also states that the preference for fre-

---

**4.** A separate statute, Section 452.400, RSMo, concerns grounds upon which a court may restrict or deny visitation to a noncustodial parent. Father, however, does not address the factors outlined in this statute.

quent, continuing and meaningful contact may be overcome upon evidence that such contact would not be in the child's best interests.[5] Here, the trial court made findings that the teenage children did not wish to have visitation with Father and that forcing the children to have visitation with Father would not be in the children's best interest at this time. While contested by Father, there was sufficient evidence adduced at trial to support those findings.

Father also raises an argument, in passing, that the trial court erred because it failed to make a finding that "no contact with [Father] was in the children's best interests." We conclude that such a finding was unnecessary, given that Father made no request for forms of contact with the children other than visitation.

■ Father's second argument in this point on appeal is that the trial court erred by failing to identify the statutes used in reaching its judgment. He does not develop this issue in his brief. We, therefore, decline to take up that issue. *See Bratt v. Cohn,* 969 S.W.2d 277, 283 (Mo.App.1998).

With regard to Father's third argument in this point on appeal, he concedes that his general request for findings of fact was insufficient to trigger any obligation for the trial court to render findings on specific factual issues. However, he argues that the trial court was nevertheless obligated, pursuant to Rule 73.01, to articulate in its judgment the legal grounds for its judgment. His claim that the trial court failed to do so is plainly contradicted by the judgment itself, which clearly states that the denial of visitation was made upon the basis that visitation was not in the children's best interests.

None of the arguments raised by Father in his second point on appeal have merit. Point denied.

## III. The Trial Court Did Not Err in Calculating Child Support

Father's final point on appeal contends that the trial court erroneously applied the law in calculating his child support obligation to the children. He challenges the court's calculation on numerous grounds: (1) the trial court's failure to permit discovery regarding the guardians' income for consideration in the Form 14 calculation; (2) the imputation to Mother of less income than she was actually earning; (3) failing to adjust Mother's income due to her support obligation for another child in her custody; (4) crediting Mother for payment of extraordinary child care expenses that she was not actually paying; (5) failing to consider Father's ability to pay extraordinary child care expenses; and (6) requiring Father to pay $194 per month for health insurance when Mother was providing insurance through a family plan at a lower cost.

■ Determinations of child support involve a two step process. First, the trial court calculates the parties' presumed child support amount through the use of Form 14, which is essentially a mathematical process to ensure that the child support guidelines are followed. *See Nelson v. Nelson,* 25 S.W.3d 511, 520 (Mo.App. 2000). In the second step, the trial court makes a determination of whether that presumed child support amount has been rebutted as being unjust and inappropriate. This second step involves the exercise of sound and broad discretion by the trial court. *Id.*

---

**5.** Section 452.400.1 also states that visitation may be restricted or denied if it "would en-

danger the child's physical health or impair his emotional development."

*A. The Trial Court Did Not Abuse Its Discretion By Denying Father Discovery Regarding The Grandparents' Income*

■ Regarding Father's first argument, he takes the position that he should have been permitted to engage in discovery regarding the Grandparents' income. He contends that such information was relevant for the purpose of determining "the lifestyle to which [the children] are entitled." He relies upon Rule 88.01. Father claims that Rule 88.01 and § 452.340, RSMo, have essentially made guardians' income a "relevant factor" in determining child support.

Pursuant to Supreme Court Rule 56.01(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action. . . . It is not ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

■ That said, a party's right to discovery is not completely unfettered. The trial court has an important role in managing discovery, by undertaking "the pragmatic task of weighing the conflicting interests of the interrogator and the respondent." *State ex rel. Hoffman v. Campbell,* 428 S.W.2d 904, 906 (Mo.App. 1968). In addition to considering issues of whether the information sought in discovery is relevant or subject to privilege, the trial court should consider the extent to which the information sought would invade the privacy of the responding party or other individuals. *See Edwards v. Mo. State Bd. of Chiropractic Exam'rs,* 85 S.W.3d 10, 22 (Mo.App.2002). Faced with such issues, the court "must also balance the need of the interrogator to obtain the information against the respondent's burden of furnishing it. . . ." *Id.*

"The propriety of discovery is a matter within the discretion of the trial court[,] and we may not disturb the ruling of the trial court except for abuse of that discretion." *State ex rel. Kuehl v. Baker,* 663 S.W.2d 410, 411 (Mo.App.1983). "Discretion is abused when the ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Edwards,* 85 S.W.3d at 23 (citing *Redfield v. Beverly Health & Rehab. Servs., Inc.,* 42 S.W.3d 703, 711 (Mo.App. 2001)). With those principles firmly in mind, we turn to the trial court's refusal to permit discovery of the Grandparents' income.

The ultimate question posed by the parties, here, is whether information regarding the Grandparents' income was relevant in the proceedings below. Father relies upon general language in Rule 88.01 that the trial court should "consider all relevant factors, including all relevant statutory[6] factors" in reaching its decision as to the proper amount of child support. He also argues that the information was relevant because Section 452.340.1(5) required the trial court to consider "the child's physical

6. The statutory factors are those contained within Section 452.340.1, RSMo, which are: "(1) the financial needs and resources of the child; (2) the financial resources and needs of the parents; (3) the standard of living the child would have enjoyed had the marriage not been dissolved; (4) the physical and emotional condition of the child, and the child's educational needs; (5) the child's physical and legal custody arrangements, including the amount of time the child spends with each parent and the reasonable expenses associated with the custody and visitation arrangements; and (6) the reasonable work-related child care expenses of each parent."

and legal custody arrangements" in determining the appropriate amount of child support. He takes the position in his brief that the Grandparents' income was relevant for determining the lifestyle to which the children are entitled.

We disagree with Father's contention that the Grandparents' income is relevant to the trial court's determination of the appropriate amount of child support. Guardians are not obligated to use their personal financial resources to support their wards. See § 475.120.4, RSMo. Because the parents' child support obligation is independent of the income of the Grandparents, as guardians, that obligation is not subject to variation based upon their financial status. It follows that information regarding the Grandparents' income was not relevant to the issues presented below.

Father has not offered any other rationale that discovery regarding the Grandparents' income should have been permitted to proceed, such as any claim that such discovery would lead to discovery of admissible evidence. We therefore conclude that the trial court did not abuse its discretion in denying Father's request for discovery regarding the Grandparents' income.

*B. The Trial Court's Findings Regarding Mother's Income Were Supported By Substantial Evidence And Were Not Against The Weight Of The Evidence*

■ Father's second subpoint argues that the trial court erred in using an income amount for Mother in the Form 14 calculations that was substantially lower than the amount she was earning at the time of trial. We conclude that the income amount employed by the trial court was supported by substantial evidence. Mother testified at trial that she was changing jobs for one closer to home as she was having difficulty falling asleep on the commute home from her present job. The income amount employed in the trial court's calculations was based upon the hourly rate Mother testified that she anticipated earning after she had been working at the new position for thirty days. The trial court apparently found her testimony to be credible, both in terms of the necessity for the change of employment and the salary she anticipated earning. We find that substantial evidence supported the trial court's determination of Wife's projected income and that the determination was not against the weight of the evidence.

*C. Father Lacks Standing To Contest The Trial Court's Failure To Consider Wife's Support Obligation For Another Child*

■ In his third subpoint, Father contends that the trial court erred by failing to include in the Form 14 child support calculations Mother's support obligation for another child. He apparently acknowledges, however, that including that support obligation would have had the net effect of *increasing* his support obligation by apparently $41.00 per month. Nevertheless, Father takes the position that he was required to disclose this error because of counsel's responsibility to disclose adverse legal authority,[7] given that Mother is not participating in this appeal to raise this issue.

---

**7.** The ethical responsibility under Rule 4–3.3(a)(3) is to disclose adverse *legal authority*. It requires disclosure of cases or statutes that do not support the arguments asserted. *See Weiland v. Dir. of Revenue*, 32 S.W.3d 628, 631 n. 2 (Mo.App.2000). It does not require a party to raise allegations of error on behalf of other parties, even if that party is not participating in the appeal.

We decline to take up this issue, because Father has no standing to raise it on appeal. Regarding this issue, Father is not an aggrieved party, as this portion of the judgment does not operate to the prejudice of his personal or property rights or interests. *See Calarosa v. Stowell,* 32 S.W.3d 138, 143 (Mo.App.2000). If he is not an aggrieved party, he does not have standing to appeal this issue. *See Jackson County Bd. of Election Comm'rs v. Paluka,* 13 S.W.3d 684, 687 (Mo.App.2000).

## D. The Trial Court did not Commit Reversible Error In Its Classification Of The Extraordinary Child Care Expenses On The Form 14

 For his fourth subpoint, Father contends that certain expenses paid for by the Grandparents, such as private school expenses, piano lessons, sports uniforms and fees, and the like, were improperly included in the Form 14 as extraordinary child care expenses being paid by Mother. Per the trial court's judgment, the Grandparents were incurring extraordinary child care expenses in the amount of $330 per month for parochial school tuition, school uniforms, piano lessons, and sports uniforms and fees. Only $250 of that amount was included in the Form 14 calculations. Due to the parents' relative income percentages, Father was only responsible for $132.50 per month in extraordinary child care expenses.

With regard to the handling of those expenses on the Form 14, Grandparents acknowledge that they were incurring those expenses, rather than Mother. Grandparents take the position, however, that the trial court's action in placing those expenses in the corresponding space in Mother's column on the Form 14 was merely the Court's mechanism to incorporate those expenses into the Form 14 calculations for the purposes of calculating the parents' respective child support obligation, given that Form 14 does not contain a separate line-item for extraordinary child care expenses being paid for by third parties. In any event, there seems to be no confusion that the expenses were incurred by Grandparents and not Mother.

While we are aware of no reported authority discussing this precise issue, we conclude that the trial court did not abuse its discretion by incorporating the extraordinary childcare expenses in the Form 14 calculation in this particular manner. Again, there is no separate column on the Form 14 for expenses being incurred by third party guardians such as Grandparents. However, it is still appropriate to include those extraordinary costs in the Form 14 calculation.

In any event, even if the expenses were placed in Mother's column on the Form 14, she did not, as a result, receive any improper benefit in the child support calculations, nor did it improperly prejudice Father. Regardless of the party incurring the expenses, all those expenses are totaled, then apportioned between the parties according to their percentage of income. Thus, even if the trial court's classification of the expenses on the Form 14 was technically incorrect, that error was, at best, harmless.

We find that the trial court did not abuse its discretion in including the extraordinary child care expenses in the Form 14 calculation in this manner.

## E. The Trial Court Properly Considered Father's Ability To Pay For Extraordinary Child Care Expenses

 In his fifth subpoint, Father argues that extraordinary child care expenses should not have been allowed by the trial court, as there was no evidence that he was able to afford those extraordi-

nary expenses.[8] Father correctly points out that the trial court is obligated to consider a parent's financial resources and needs of the parents with regard to the question of whether the Form 14 presumed child support amount is unjust and inappropriate. *See Taranto v. State Dept. of Soc. Svcs.*, 962 S.W.2d 897, 902 (Mo.App. 1998). The trial court has broad discretion in determining whether to rebut the presumed child support amount as unjust and inappropriate. *Schriner v. Edwards*, 69 S.W.3d 89, 93 (Mo.App.2002).

Father contends that the trial court abused its discretion by failing to take into consideration certain work-related expenses he incurred on a consistent basis. Father states that he has to make weekly installment payments of $50 for the tools he has purchased for work and which were necessary to perform his employment-related duties. He alleges in his brief that income averages between $150 and $250 per week. He therefore apparently claims that this work related expense renders his presumed child support amount unjust and inappropriate.

We view the facts below, however, in the light most favorable to the judgment. *See*

*Reeves–Weible v. Reeves,* 995 S.W.2d 50, 56 (Mo.App.1999). Viewed in that light, the record below supports a conclusion that Father earns significantly more than he alleges in his brief. The trial court employed a gross income of $1,658[9] per month as Father's income in the Form 14 calculations. This is also the amount of monthly income Father claimed on his proposed Form 14 calculation. Father also averred in the income and expense statement he filed with the court that he had an income of $271 per week, after tax withholding and other deductions (including the $96 per pay period that was currently being deducted for child support). There was substantial evidence that supported the trial court's findings with regard to Father's income, much of it adduced by Father, and that finding was not against the weight of the evidence.

Based upon the Form 14 calculations, his presumed monthly child support obligation was determined to be $454. He was also ordered to supply health insurance for the children, which was anticipated to cost $194 per month, for a total of $648 per month. However, he was then credited for the medical insurance pay-

8. Father also contends in his argument under this subpoint that permitting those expenses was inappropriate because he was opposed to the children's private school expenses. This argument lies outside of Father's stated point on appeal, and we could deny it on that basis alone. *See Engeman v. Engeman*, 123 S.W.3d 227, 237 (Mo.App.2003). His argument, however, is without merit as it is contradicted by the record.

Father correctly points out that he requested in his "Motion to Limit Guardianship" that the children be placed in public school. His testimony at trial, however, undermined that request. Father stated that he believed that the children were receiving a good education at the parochial school, that the children's extracurricular activities were good for them, and that he wanted to support them in those activities.

While Father may have objected to that expense in his pleadings, his trial testimony indicates his belief that the children's parochial schooling and extracurricular activities were beneficial to the children and he supported those endeavors. Father fails to direct us to any evidence in the record that he continued to maintain any objection to the children's schooling and activities or any evidence that would have supported a conclusion that placing the children in public school would have been in their best interests.

9. Father's income may have even been higher than this amount. The judgment also includes a finding that Father testified that his gross monthly income was $1,749, which is $91 more per month than the income amount employed by the trial court in its Form 14 calculations.

ment on line 10. The net amount of support was approximately twenty-seven percent of Father's gross monthly income as found by the trial court. We conclude that the trial court did not abuse its discretion in refusing to rebut the presumed child support amount was as unjust or inappropriate. We therefore deny this subpoint.

### F. The Trial Court Did Not Abuse Its Discretion By Ordering Father To Provide Health Insurance

 In his final subpoint, Father contends that the trial court erred in ordering him to provide health insurance for the children, at a cost of $194 per month, when Mother was providing insurance for the children through a lower-cost family plan. Mother had previously provided insurance for the children at a cost to her of $58.21 every two weeks. He relies upon *Love v. Love*, 72 S.W.3d 167 (Mo.App.2002), in support of his claim that, when faced with multiple options for providing insurance for the children in a child support judgment, the trial court should prefer the lower-cost policy.

As stated previously, however, Mother was in the process of changing employment at the time of trial. Grandparents allege that Mother was not eligible for insurance benefits in her new position. There is support in the record for this allegation.[10] Viewing the evidence in the light most favorable to the judgment, it appears that, as a practical matter, the trial court effectively only had one insurance option available to it. That was to require Father to provide insurance coverage to the children through a plan available to him.

Under the circumstances, we do not believe that the trial court abused its discretion in ordering Father to provide insurance coverage for the children. We therefore deny this subpoint, together with its parent point on appeal.

### CONCLUSION

Despite the numerous subpoints within Father's three stated points on appeal, Father has presented no meritorious claim of reversible error. The basis for the trial court's jurisdiction was the 1990 guardianship judgment and that judgment is not susceptible to the collateral attack raised by Father in this proceeding. The court below did not err in finding that visitation with Father was not in the children's best interest and made sufficient conclusions regarding the legal grounds for its denial of Father's request for visitation. Nor did the trial court commit reversible error in its calculation of the parents' child support obligations. Accordingly, having denied each of Father's points on appeal and finding no reversible error in the proceedings below, we affirm the judgment of the trial court.

ROBERT G. ULRICH, Judge, and JAMES M. SMART, JR., Judge, concur.

---

10. Mother testified at trial that she would not be immediately eligible for insurance coverage at her new position and would likely not become eligible for such coverage until she became an assistant manager, which could perhaps take as long as one year.